# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JAMES ANTHONY DAVIS,

                        Petitioner,

v.

BRIAN WILLIAMS,[1] et al.,

                        Respondents.

Case No. 2:15-cv-01574-RFB-NJK

**ORDER**

## I.    INTRODUCTION

Petitioner James Anthony Davis, who pleaded guilty to first-degree murder and was sentenced to 20 years to life, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (See ECF Nos. 29, 30-25.) This matter is before this court for adjudication of the merits of Davis' first-amended petition, which alleges that (1) his plea was not knowingly, intelligently, or voluntarily entered and (2) his counsel failed to obtain his mental health treatment records. (ECF No. 29.) For the reasons discussed below, this court grants the petition.

## II.   BACKGROUND

### A.    Arraignment and sentencing

Davis was charged with beating his paraplegic roommate, Auna Vanotten, to death. (ECF Nos. 30-8 at 3; 30-9.) The prosecution filed a notice reserving its "right to file a Notice of Intent

---

[1] The state corrections department's inmate locator page states that Davis is incarcerated at High Desert State Prison. Brian Williams is the current warden for that facility. At the end of this order, this court directs the clerk to substitute Brian Williams as a respondent for respondent Dwight Neven. See Fed. R. Civ. P. 25(d).

to Seek the Death Penalty." (ECF No. 30-6.) On January 14, 2004, Davis pleaded not guilty and invoked his right to a speedy trial. (ECF No. 30-1 at 3.) A trial was set for March 1, 2004. (Id.)

On February 9, 2004, Davis moved to dismiss his counsel and for, inter alia, "an evidentiary hearing to determine counsels [sic] action and/or inaction relating to trial tactics." (ECF Nos. 30-10, 30-11.) A hearing was held on February 25, 2004, and Davis' trial counsel informed the state court that he completed his investigation but was unable to file a witness list because Davis was refusing to speak with him. (ECF No. 30-1 at 4.) The state court admonished Davis to cooperate with counsel. (Id.)

At a hearing held the morning before the trial was set to begin, the state court advised Davis that he did not have the right to choose counsel, admonished Davis to listen to counsel, and ordered that the prohibition Davis placed on counsel's ability to visit him at the jail be lifted. (Id. at 16.) The following afternoon, Davis signed a guilty plea agreement and pleaded guilty to first-degree murder. (ECF Nos. 30-1 at 17; 30-21; 30-22.) The plea agreement provided that the parties stipulated to a sentence of life with the possibility of parole after 20 years. (ECF No. 30-21 at 2.) As a part of that plea agreement, counsel certified that Davis was "competent and understands the charges and the consequences of pleading guilty." (Id. at 7.) During his plea canvass, Davis answered in the affirmative when asked if he read "[e]very single page, every single line" of the plea agreement before signing it. (ECF No. 30-22 at 5.) The state district court determined that Davis "understands the nature of the offense, the consequences of his plea." (Id. at 8.)

At the sentencing hearing, counsel commented that he "was disappointed the PSI did not identify why [Davis] was on disability for the last 15 years or so" because Davis "was put into a mental institution at roughly the age of 11 or 12" when "his parents got tired of dealing with him." (ECF No. 30-24 at 4.) Counsel then commented, "the problems he's had have been mental health

1  oriented for most of the last 20-some-odd-years." (<u>Id.</u> at 5.) Regarding Davis' refusal to take

2  responsibility for Vanotten's death earlier in the sentencing hearing, counsel commented, "there

3  are times when he will absolutely express remorse about this, and there are times when he does

4  not express remorse . . . when he feels he is threatened." (<u>Id.</u>) And regarding Davis' lack of ties to

5  the community and the facts of the case, counsel commented, "he deals very poorly with people"

6  and he is "mentally deficient." (<u>Id.</u> at 6, 17.) The state court sentenced Davis in accordance with

7  the plea agreement to life with the possibility of parole after 20 years. (<u>Id.</u> at 19.)

8        **B.**    **Appeal and state post-conviction proceedings**

9        Davis appealed his judgment of conviction, but his appellate counsel withdrew the appeal

10  at Davis' request. (ECF Nos. 31-12; 31-19; 31-36 at 52.) Davis then sought post-conviction relief.

11  (ECF No. 31-20.) Davis was appointed post-conviction counsel and an evidentiary hearing was

12  held. (ECF No. 31-36.)

13        At the post-conviction evidentiary hearing, regarding investigating Davis' mental health,

14  trial counsel testified, <u>inter alia</u>, that (1) he spoke with Davis' father prior to the preliminary

15  hearing, and Davis' father reported that Davis had a history of mental illness, (2) he believed Davis

16  had been "incarcerated in a facility," but when post-conviction counsel asked if he meant "[a]

17  mental facility," trial counsel stated he "thought it was a juvenile criminal facility," (3) he

18  explained that he "started the investigation on" Davis' records from the institutions he had been in

19  as a child, but he "was very concerned about these records because there was information that

20  [Davis' father] relayed to [him regarding Davis sexually molesting his sister] which [would have

21  been] extremely damaging if it ever came to light," and (4) he did not believe he "ever received a

22  full investigation [of the institutional records] because of the short time this case had." (ECF No.

23  31-36 at 15–16, 21–22, 34.)

Regarding trial counsel's assessment of Davis' mental health issues, trial counsel testified, inter alia, that (1) he did not think "there[ was] any doubt at all but that [Davis] ha[d] mental health issues and problems," but he "did not believe then and [still did not believe at the post-conviction evidentiary hearing] that he could have [presented] a viable insanity defense," (2) he thought "Davis had a command of the facts, a command of the courtroom proceedings, that just suggested it was a waste of time to do the mental health defense," (3) he thought Davis "had a difficulty [sic] accepting the facts that he was dealing with" but "always found [Davis] competent in discussing his case, his facts and the legal position," (4) Davis "had no problem at all dealing with the concept of the Alford plea versus the regular plea," (5) Davis was "clearly a man who has mental health issues," but he "just [did not] think that they go to his competency," (6) he "had absolutely no doubt that [Davis] was competent to participate in the process[,] . . . absolutely no doubt that he was competent to enter a plea[, and] . . . absolutely no doubt that he was able to understand what was going on," and (7) "the information [trial counsel] was gathering from [Davis'] father was more relevant to . . . a possible mitigation factor at sentencing, because frankly if [Davis] is mentally ill, . . . it just did not affect his ability to participate in the process, understand what was going on." (ECF No. 31-36 at 31–33, 50.)

And regarding the plea deal, trial counsel testified, inter alia, that (1) he recommended Davis take the prosecution's plea offer of life with the possibility of parole after 20 years "because [he] felt that if a jury got this case, a sentence of life without would be likely," (2) he had his investigator interview witnesses from Davis' apartment complex regarding Davis' defense that his girlfriend, Jackie Brown, killed Vanotten, but "[t]he information that was obtained from the investigation was detrimental to Davis in the extreme," (3) Davis was "very agitated and upset" at the hearing on March 1, 2004, but "[h]e had absolutely no animosity" the following day and "was

eager to take the deal," (4) he wanted to continue the trial for more time to investigate, but Davis "insisted he wanted the speedy trial," and (5) "the offer was as good as it was going to get considering the facts, and [trial counsel] was so afraid of what would happen if the prosecutor learned about the sexual molestation, because [he] was afraid that that would prompt [the prosecutor] to abandon the 20-to-life offer." (ECF No. 31-36 at 9–11, 31, 36–37.) Trial counsel testified that allowing Davis to withdraw his plea and go to trial would be "[t]he worst thing . . . that could possibly happen" because Davis "face[d] a life without sentence" given the following "overwhelming" evidence of Davis' guilt:

> [I]t all comes down to the fact that you've got the fact that he admits beating this woman. You've got him telling somebody that he ought to kill her. Then you have Jackie Brown who would testify at least to the idea that she heard James beating the woman to death. Then you have the nature of her injuries from blunt force trauma, and then you have the fact that she's a paraplegic and unable to defend herself, and she had defensive wounds on her body.

(Id. at 40, 42–43, 46.)

Davis' appellant counsel testified at the post-conviction evidentiary hearing that he "made an assessment that [Davis] understood the ramifications of his plea, and that when he entered it, he probably did so knowingly and voluntarily." (ECF No. 31-36 at 57.) Contrarily, Davis testified at the post-conviction evidentiary hearing that he never read or signed the plea agreement, claiming his signature was forged, and he was forced to plead guilty at the arraignment by trial counsel, who told him, "[d]on't say nothing and just answer the Judge's question and get it over with." (Id. at 85, 91.)

The state district court judge, who presided over Davis' arraignment and sentencing, made the following comment at the post-conviction evidentiary hearing:

> I absolutely remember having discussions with Mr. Davis the day before that we actually entered the plea in this case. I remember how antagonized he was. I

> remember actually being kept out of the courtroom during the time that Mr. Davis was having conversations with his attorney because . . . my staff felt that there was a little bit of time that I shouldn't be in the courtroom before we got going. They wanted to sort of allow the Defendant to either calm down or for the counsel to calm down.

(ECF No. 31-36 at 108.) The state district court allowed Davis' post-conviction counsel additional time following the post-conviction evidentiary hearing to receive Davis' records from the Sagamore Children's Psychiatric Center, and after those records were received, the state district court reviewed them in camera. (See ECF No. 32 at 3–5.) Following that review, the state district court denied Davis' post-conviction petition, explaining, in part, that

> the records are interesting and they certainly document a young man who had some problems, but they do not make a diagnosis that would . . . cause me to make a decision that both the outcome would have been different had these records been before us and/or that a neurological evaluation had been done, or that the Defendant was unable to understand or to make a knowing and voluntary waiver.

(Id. at 15.)

## C.    Sagamore Children's Psychiatric Center records

Davis' Sagamore Children's Psychiatric Center records report that he was placed in the facility for two and a half years beginning in July 1981 at the age of thirteen. (ECF No. 35 at 4, 6.) Regarding his history prior to his placement at Sagamore, the records provide that Davis "ha[d] been tied up, beaten numerous times, and gagged by his mother" and "was thrown head-first" in a wall and "had his fingers broken by his father." (Id. at 12.) Two weeks prior to his admission to Sagamore, Davis tore up $550.00 in rent money and ran away from home. (Id.) Davis' father found him and took him to a police station "and reportedly told them he was going to kill [Davis] unless some action was taken." (Id.)

A CPS worker took Davis to Seabury Barn as a temporary placement. (Id.) After two weeks, Davis was accused of stealing a radio and became violent. (Id.) Seabury Barn personnel

requested that Davis leave, and Davis was informed that he was going home. (Id.) Davis ran away, and when he returned, he saw his father and police at the facility. (Id.) Davis "began to hyperventilate, screaming and yelling that he refused to go home thrusting his fists towards his father and the police." (Id.) Davis was handcuffed and "refused to calm down causing him to vomit excessively." (Id.) The police escorted Davis to a family court where "[t]he Court placed him in a straight jacket and remanded him to Sagamore." (Id.)

Upon intake, Sagamore reported, inter alia, that (1) Davis had a history of disturbed behavior and attended "special class," (2) Davis' "[i]nsight and judgment [were] rather poor," and (3) Davis was diagnosed with "[c]onduct [d]isorder-[u]ndersocialized [a]gressive" and "[a]ttention deficit disorder with hyperactivity." (Id. at 4.) A diagnostic evaluation conducted in August 1981, a month after Davis entered Sagamore, demonstrated, inter alia, that (1) Davis was "functioning within the borderline range with a Verbal I.Q. of 67, Performance I.Q. of 81 and FullScale I.Q. of 72," (2) Davis "showed neurological impairment and was consistent with that of a seven year old child," and (3) Davis was "impulsive and anxious" and had to be "placed in restraint a few times." (Id. at 5.) A diagnostic evaluation conducted a year later in August 1982 demonstrated, inter alia, that (1) Davis's FullScale I.Q. was 72, Verbal I.Q. was 69, and Performance I.Q. was 78, (2) Davis had "borderline intellectual capacity," (3) Davis was "limited in terms of conceptual abilities," (3) Davis' "grade scores reflect[ed] a mid-elementary school grade level," (4) Davis "should be treated as a learning disabled child," and (5) Davis' "judgment appear[ed] to be slightly impaired in that he has difficulty understanding the manifest consequence of his behavior." (Id. at 6, 9–10.)

**D.    Federal habeas proceedings**

Sharon Jones-Forrester, Ph.D. performed a neuropsychological evaluation of Davis on May 19, 2017, at the Lovelock Correctional Center. (ECF No. 61-1 at 2.) In Dr. Jones-Forrester's report, she explained Davis' understanding of legal charges and proceedings as follows:

> James has borderline intellectual functioning, poor comprehension skills, a relatively low reading level, and tends to be concrete. However, he has a good rapport with his defense attorney, is comfortable admitting when he does not understand information, and willingly asks for clarification and repetition of information as needed. He demonstrated a good understanding of his charges, but had some difficulty with identifying potential consequences of these. He had subtle difficultly with identifying the roles played by members of the legal community including his defense team, the prosecution, the jury, and the judge, and these difficulties appear to be primarily attributable to clear distrust and paranoia. He appeared to demonstrate a basic understanding of courtroom proceedings. It should also be noted that he demonstrated a fixed belief that he had been falsely accused, and from his perspective, he appears to be having difficulty understanding how his present charges interact with this perspective. Thus, while he does appear to meet the Dusky Standard and Nevada NRS 178.400 with regard to basic competency, it is highly likely that his low intellectual functioning, relatively low literacy, and significant neurocognitive and psychiatric deficits may negatively impact his ability to understand legal information and the legal consequences of his actions, carefully and consistently follow legally required case filing deadlines, and make decisions with regard to his case with a reasonable degree of rational understanding. Further, his borderline intellectual functioning is expected to be lifelong and is not amenable to restoration. His neurocognitive deficits are also unlikely to improve to the point where they would not render any day-to-day functional impairment. His neurocognitive deficits will be more pronounced when he is stressed, rushed, or in distracting, unfamiliar environments.

(Id.) And regarding her neurocognitive evaluation, Dr. Jones-Forrester explained the following:

> In James' case, his borderline intellectual functioning and neurocognitive deficits will lead him to struggle with carefully and efficiently attending to, and processing legal information that is presented to him.
> . . . .
>
> His executive functioning deficits will lead him to have occasional difficulties with impulsivity, and make it challenging for him to engage in careful deductive reasoning, focus on multiple details, and effectively shift his attention, all of which are expected to further impede his ability to effectively navigate complex procedural guidelines. Summarily, . . . his low intellectual functioning, relatively low literacy, and significant neurocognitive deficits are likely to negatively impact his ability to understand legal information and the legal

8

consequences of his actions, carefully and consistently follow legally required case filing deadlines, and make decisions with regard to his case with a reasonable degree of rational understanding.

. . . .

Summarily, his borderline intellectual functioning, neurocognitive deficits, and psychiatric difficulties are expected to intersect in a manner that will exacerbate each of these difficulties, and may pose an ongoing barrier to his ability to have a clear factual and rational understanding of information related to his case and ability to participate in his defense with a reasonable and rational degree of understanding.

(Id. at 8–9.)

This court held an evidentiary hearing on the timeliness of Davis' federal petition, and Dr. Jones-Forrester testified at that hearing. (See ECF No. 95.) Dr. Jones-Forrester testified, inter alia, that (1) Davis "has borderline intellectual functioning with a full-scale IQ of 72," meaning "his full-scale IQ is two points above what we would see typically for individuals diagnosed with intellectual disability," (2) Davis "has difficulties with attention, concentration, and mental tracking," (3) she diagnosed Davis "with unspecific neurocognitive disorder" which "refers to situations in which there are likely multiple causes for the cognitive deficit," post-traumatic stress disorder, severe major depressive disorder, insomnia disorder, and alcohol and substance abuse disorders, (4) Davis is "likely to have difficulty with understanding directions and also with effectively and appropriately expressing himself due to his language difficulties," and (5) Davis' "borderline intellectual functioning alone suggests that he'll have significant difficulties with comprehension and with decision making." (Id. at 21, 26–27, 31, 34, 53.)

## III.   GOVERNING STANDARDS OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under AEDPA:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405–06 (2000), and citing Bell v. Cone, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 75 (quoting Williams, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." Id. (quoting Williams, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.

at 102 (citing <u>Lockyer</u>, 538 U.S. at 75); <u>see also</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## IV.    DISCUSSION

### A.    Ground 1—validity of guilty plea

In ground 1, Davis alleges that his plea was not knowingly, intelligently, or voluntarily entered in violation of his right to due process guaranteed by the Fifth and Fourteenth Amendments because he did not have the intellectual capacity to evaluate the consequences of his plea. (ECF No. 29 at 16.)

### 1.    Relevant law

The federal constitutional guarantee of due process of law requires that a guilty plea be knowing, intelligent, and voluntary. <u>See</u> <u>Brady v. United States</u>, 397 U.S. 742, 748 (1970); <u>Boykin v. Alabama</u>, 395 U.S. 238, 242 (1969). "The voluntariness of [a petitioner's] plea can be determined only by considering all of the relevant circumstances surrounding it." <u>Brady</u>, 397 U.S. at 749. Addressing the "standard as to the voluntariness of guilty pleas," the Supreme Court has stated: a "plea of guilty entered by one fully aware of the direct consequences . . . must stand unless induced by threats . . . , misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business." <u>Id.</u> at 755; <u>see also</u> <u>North Carolina v. Alford</u>, 400 U.S. 25, 31 (1970) (noting that the longstanding "test for determining the validity of guilty pleas" is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant").

A criminal defendant may not plead guilty unless he does so competently. <u>Godinez v. Moran</u>, 509 U.S. 389, 396 (1993). To meet the competency standard to plead guilty, it must be determined "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has a 'rational as well as factual understanding of the proceedings against him.'" <u>Id.</u> (quoting <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960)); <u>see also</u> <u>Drope v. Missouri</u>, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subject to a trial."); <u>Miles v. Stainer</u>, 108 F.3d 1109, 1112 (9th Cir. 1997) ("When analyzing competence to plead guilty, we look to whether a defendant has 'the ability to make a reasoned choice among the alternatives presented to him.'" (quoting <u>Chavez v. United States</u>, 656 F.2d 512, 518 (9th Cir. 1981))).

### 2. State court determination

In affirming the denial of Davis' post-conviction petition, the Nevada Supreme Court held:

Appellant further failed to demonstrate that he was incompetent to proceed to trial.

> [FN7] <u>See</u> <u>Melchor-Gloria v. State</u>, 99 Nev. 174, 660 P.2d 113 (1983) (holding that the test for competency is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether the defendant has a rational as well as factual understanding of the proceedings against him); <u>see also</u> <u>Dusky v. United States</u>, 362 U.S. 402 (1960).

A review of [sic] transcript of the plea canvass reveals that appellant answered all questions appropriately. The district court reviewed appellant's mental health records from his institutionalization when he was a teenager and concluded that the records did not contain any information that would have altered the outcome of the proceedings. Substantial evidence supports the conclusions of the district court, and thus, we conclude that the district court did not err in denying this claim.

. . . .

12

Next, appellant claimed that his guilty plea was unknowingly and involuntarily entered. A guilty plea is presumptively valid, and a petitioner carries the burden of establishing that the plea was not entered knowingly and voluntarily.

[FN13] <u>Bryant v. State</u>, 102 Nev. 268, 721 P.2d 364 (1986); <u>see also</u> <u>Hubbard v. State</u>, 110 Nev. 671, 877 P.2d 519 (1994).

Further, this court will not reverse a district court's determination concerning the validity of a plea absent a clear abuse of discretion.

[FN14] <u>Hubbard</u>, 110 Nev. at 675, 877 P.2d at 521.

In determining the validity of a guilty plea, this court looks to the totality of the circumstances.

[FN15] <u>State v. Freese</u>, 116 Nev. 1097, 13 P.3d 442 (2000); <u>Bryant</u>, 102 Nev. 268, 721 P.2d 364.

Appellant claimed that he was forced into entering a guilty plea and that he had not read the guilty plea agreement. Appellant further claimed that he did not sign the guilty plea agreement. Appellant failed to carry his burden of demonstrating that his plea was invalid. Appellant affirmatively acknowledged during the plea canvass that he was not forced or threatened into entering a guilty plea in the instant case. Appellant further affirmatively acknowledged that he had read the guilty plea agreement, "Every single page. Every single line." The record contains a written guilty plea agreement bearing the signature of appellant, the district attorney, and defense counsel. During the plea canvass, appellant affirmatively acknowledged that he signed the guilty plea agreement. Appellant's trial counsel testified at the evidentiary hearing that appellant signed the guilty plea agreement in counsel's presence. Therefore, we conclude that the district court did not err in denying this claim.

(ECF No. 32-16 at 7–8, 10–11.)

### 3. <u>De novo</u> review

Davis argues that this court should review this ground <u>de novo</u> because the Nevada Supreme Court (1) never assessed whether his plea was competent in light of his Sagamore records, (2) failed to articulate any discernable test regarding the constitutionality of his plea, and (3)

1  unreasonably determined that his Sagamore "records did not contain any information that would

2  have altered the outcome of the proceedings." (ECF No. 108 at 13, 18–19.)

3         Davis's first contention is belied by the Nevada Supreme Court's order, wherein the

4  Nevada Supreme Court held that substantial evidence supported the state district court's

5  conclusion that Davis's "mental health records from his institutionalization [at Sagamore] when

6  he was [a] teenager . . . did not contain any information that would have altered the outcome of the

7  proceedings." (ECF No. 32-16 at 8.) Davis's second contention is also belied by the Nevada

8  Supreme Court's order, wherein the Nevada Supreme Court provided (1) the test for competency,[2]

9  (2) the requirement that a plea must be entered knowingly and voluntarily, and (3) the requirement

10 that a court look to the totality of the circumstances in assessing the validity of a plea. (Id. at 7 n.7,

11 10.)

12        However, this Court finds Davis's third contention—his contention regarding his

13 Sagamore records containing information that would have altered the outcome of his guilty plea

14 proceedings—to have merit. Davis's Sagamore records steadfastly and objectively demonstrate

15 that he has borderline intellectual functioning, learning disabilities, and neurological impairments.

16 This information undoubtedly correlates to Davis's ability to competently plead guilty to first-

17 degree murder.[3] As such, the Nevada Supreme Court's statement that substantial evidence

18 supported that Davis's Sagamore "records did not contain any information that would have altered

19 _____

20 [2] Notably, the standard for competency to stand trial is the same as the standard for competency to
   plead guilty. See Godinez v. Moran, 509 U.S. 389, 398 (1993) (rejecting "the notion that
   competence to plead guilty or to waive the right to counsel must be measured by a standard that is
21 higher than (or even different from) the Dusky standard" for competence to stand trial).

22 [3] This court is cognizant of the fact that an intellectual disability alone can be insufficient to
   establish incompetency. See Atkins v. Virginia, 536 U.S. 304, 318 (2002) (recognizing that those
23 with intellectual disabilities are "frequently . . . competent to stand trial"). However, in Davis's
   case, it is readily apparent from his Sagamore records that he suffers from a multitude of mental
   issues relating to his competency.

the outcome of" his guilty plea proceedings was based on an unreasonable determination of the facts. Consequently, ground 1 is reviewed de novo. See Panetti v. Quarterman, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires"); Hurles v. Ryan, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that . . . the state court's decision was based on an unreasonable determination of the facts, we evaluate the claim de novo."). Therefore, this court is not precluded from considering evidence—namely, Dr. Jones-Forrester's evaluation—that was not before the Nevada Supreme Court at the time it considered Davis' appeal of the denial of his state habeas petition. Cf. Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").[4]

### 4.    Analysis

Davis signed the guilty plea agreement, was canvassed regarding his guilty plea, and was found by the state district court to have understood the charge and consequences of his plea. These facts carry a presumption that Davis's guilty plea was valid. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) (explaining that the defendant's representations and "any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings" because "[s]olemn declarations in open court carry a strong presumption of verity"); Muth v. Fondren, 676 F.3d 815, 821 (9th Cir. 2012) ("Petitioner's statements at the plea colloquy carry a

---

[4] The consideration of Dr. Jones-Forrester's evaluation within the context of this ground does not appear to be precluded by Shinn v. Ramirez, as this evidence, which is admittedly beyond the state-court record, is not based on any error made by Davis's post-conviction counsel. See Shinn v. Ramirez, 142 S.Ct. 1718, 1734–35 (2022) (holding that "a federal habeas court may not . . . consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel . . . because there is no constitutional right to counsel in state postconviction proceedings").

strong presumption of truth."). However, this presumption is decidedly overshadowed by Davis's documented underlying mental impairments.

In 2017, Dr. Jones-Forrester completed a neuropsychological evaluation on Davis and concluded, inter alia, that (1) Davis had difficulty identifying the consequences of his charges and the roles played by members of the legal community, (2) Davis's "low intellectual functioning, relatively low literacy, and significant neurocognitive and psychiatric deficits may [have] negatively impact[ed] his ability to understand legal information and the legal consequences of his actions," including "mak[ing] decisions with regard to his case with a reasonable degree of rational understanding," and (3) Davis's "borderline intellectual functioning, neurocognitive deficits, and psychiatric difficulties . . . intersect in a manner that [would] exacerbate each of these difficulties, and may pose an ongoing barrier to his ability to have a clear factual and rational understanding of information related to his case and ability to participate in his defense with a reasonable and rational degree of understanding." (ECF No. 61-1.) These findings are crucial because they demonstrate that Davis likely did not have a sufficient ability to consult with counsel with a reasonable degree of rational understanding or a rational and factual understanding of the proceedings against him. This court acknowledges that this evaluation was completed more than a decade after Davis pleaded guilty, but because Dr. Jones-Forrester's 2017 cognitive impairment findings in many ways mirror Sagamore's 1981 cognitive impairment findings—e.g., Davis's full-scale IQ being consistent at 72—Davis likely suffered from these same cognitive impairments in 2004 at the time he pleaded guilty.

In sum, the combination of Dr. Jones-Forrester's evaluation, Davis's Sagamore records, and the lack of any supplemental measures having been taken on the record to guarantee that Davis had the capacity to understand the nature and object of the proceedings against him, this court is

1  not confident that Davis's guilty plea was competent. <u>Godinez</u>, 509 U.S. at 396; <u>Dusky</u>, 362 U.S.

2  at 402. Davis is entitled to habeas relief on ground 1.[5]

3  **B.  Ground 2—failure to obtain mental health records**

4  In ground 2, Davis alleges that counsel's failure to obtain his mental health treatment

5  records violated his Sixth and Fourteenth Amendment rights to the effective assistance of counsel.

6  (ECF No. 29 at 30.) Davis contends that these records could have assisted at trial or in determining

7  whether he was competent to enter a plea. (<u>Id.</u>)

8  **1.  Relevant law**

9  In <u>Strickland v. Washington</u>, the Supreme Court propounded a two-prong test for analysis

10  of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the

11  attorney's "representation fell below an objective standard of reasonableness," and (2) that the

12  attorney's deficient performance prejudiced the defendant such that "there is a reasonable

13  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

14  been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective

15  assistance of counsel must apply a "strong presumption that counsel's conduct falls within the

16  wide range of reasonable professional assistance." <u>Id.</u> at 689. The petitioner's burden is to show

17  "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed

18  the defendant by the Sixth Amendment." <u>Id.</u> at 687. Additionally, to establish prejudice under

19  <u>Strickland</u>, it is not enough for the habeas petitioner "to show that the errors had some conceivable

20  effect on the outcome of the proceeding." <u>Id.</u> at 693. Rather, the errors must be "so serious as to

21  deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> at 687.

22

23  [5] As a practical matter, it may be redundant to discuss ground 2 of the petition given that this court has already concluded that Davis is entitled to federal habeas relief. However, in an abundance of caution, this court discusses it as follows.

When the ineffective assistance of counsel claim is based "[i]n the context of a guilty plea, the ineffectiveness inquiry probes whether the alleged ineffective assistance impinged on the defendant's ability to enter an intelligent, knowing and voluntary plea of guilty." Lambert v. Blodgett, 393 F.3d 943, 979 (9th Cir. 2004). As such, "[t]o succeed, the defendant must show that counsel's assistance was not within the range of competence demanded of counsel in criminal cases." Id. at 979–80. And regarding the prejudice prong, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Lafler v. Cooper, 566 U.S. 156, 163 (2012) ("In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice.").

## 2.      State court determination

In affirming the denial of Davis' post-conviction petition, the Nevada Supreme Court held:

> Fifth, at the evidentiary hearing, appellant's post-conviction counsel claimed that trial counsel was ineffective for failing to review appellant's mental health records during the course of his representation. Appellant's post-conviction counsel appeared to suggest that these records would have supported an insanity defense and a claim that appellant was incompetent to enter a guilty plea. Appellant failed to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. Trial counsel testified that he was aware that there was some history of mental instability and commitment to a facility, but that he did not pursue this as he learned of some potentially damaging information regarding a sexual molestation involving appellant's sister and because appellant's invocation of a speedy trial impacted a deeper investigation. Trial counsel further testified at the evidentiary hearing that he did not believe that an insanity defense was viable in the instant case. Trial counsel testified that he had absolutely no doubt as to appellant's competency to participate in the proceedings. Appellant failed to demonstrate that there was a viable insanity defense ignored by trial counsel as he failed [sic] provide any facts or demonstrate that he was in a delusional state at the time of the crime and that he did not know or understand the nature and capacity of his act or appreciate the wrongfulness of his act.
>
> [FN6] See Finger v. State, 117 Nev. 548, 27 P.3d 66 (2001) (setting forth the M'Naghten standard for legal insanity—a defendant must be in a delusional state such that he cannot know or understand the

1   nature and capacity of his act, or his delusion must be such that he
2   cannot appreciate the wrongfulness of his act).

3   (ECF No. 32-16 at 6–7.)

4   **3.   <u>De novo</u> review**

5   Davis argues that this court should review this ground <u>de novo</u> because the Nevada

6   Supreme Court used the wrong test: the test is not whether the information in the records would

7   have altered the outcome of the proceedings but whether there is a reasonable probability of a

8   different result. (ECF No. 108 at 20.) Davis also argues that this error was compounded by the

9   Nevada Supreme Court's use of a substantial evidence test instead of doing the required <u>Strickland</u>

10  analysis. (<u>Id.</u>) This court disagrees.

11  The Nevada Supreme Court did not replace the <u>Strickland</u> standard. The Nevada Supreme

12  Court correctly stated that Davis must demonstrate "prejudice such that there is a reasonable

13  probability that, but for counsel's errors, [Davis] would not have pleaded guilty and would have

14  insisted on going to trial." (ECF No. 32-16 at 3.) And regarding the Nevada Supreme Court's

15  statement that substantial evidence supported the state district court's conclusion that Davis'

16  "records did not contain any information that would have altered the outcome of the proceedings,"

17  the Nevada Supreme Court was simply holding, under the common standard of appellate review,

18  that Davis had not demonstrated that the state district court's prejudice findings were wrong. (<u>See</u>

19  ECF Nos. 32-16 at 3–4 ("[T]he district court's factual findings regarding a claim of ineffective

20  assistance of counsel are entitled to deference when reviewed on appeal" (citing <u>Means v. State</u>,

21  120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004))); 32 at 15 (state district court's finding that Davis'

22  Sagamore records "do not make a diagnosis that would in [its] mind at this junction cause [it] to

23

make a decision that both the outcome would have been different had then records been before us and/or that a neurological evaluation had been done").)

Nonetheless, the Nevada Supreme Court's statement that trial counsel testified that he did not pursue Davis's mental health records was based on an unreasonable determination of the facts, as is discussed further below. Accordingly, for this reason, this ground, like ground 1, will also be reviewed de novo.

### 4.    Analysis

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691; see also Douglas v. Woodford, 316 F.3d 1079, 1085 (9th Cir. 2003) ("Trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired."). Trial counsel testified at the post-conviction evidentiary hearing that he "started the investigation on" Davis' institutional records, but he did not believe he "ever received a full investigation [of the records] because of the short time this case had." On this record, it appears trial counsel pursued Davis' mental health records, thereby commencing the fulfilment of his investigative duties, but his ability to complete those investigative duties by receiving and reviewing the records was thwarted by Davis' insistence—against the advice of trial counsel—on having a speedy trial.[6]

Regarding Davis' implication that trial counsel should not have allowed him to plead guilty without first obtaining these records to determine whether he was competent to do so, trial counsel

---

[6] Trial counsel's inability to obtain the records in a two-to-three-month period between December 9, 2003—the date Vanotten was murdered—and March 2, 2004—the date Davis changed his plea—is supported by post-conviction counsel's statement at the post-conviction evidentiary regarding the numerous steps and time it took to get the Sagamore records: "$50 and a couple of letters and a couple of follow-up phone calls." (ECF No. 32 at 7.)

testified at the post-conviction evidentiary hearing that he "always found [Davis] competent in discussing his case, his facts and the legal position" and although Davis was "clearly a man who has mental health issues," he "just [did not] think that [the mental health issues went] to his competency." Consequently, because trial counsel steadfastly believed that Davis was competent to plead guilty based on his experience and interactions with him, Davis fails to demonstrate that trial counsel's "representation fell below an objective standard of reasonableness" or "was not within the range of competence demanded of counsel" in allowing to enter a guilty plea before receiving the Sagamore records. <u>Strickland</u>, 466 U.S. at 688 (explaining that "[j]udicial scrutiny of counsel's performance must be highly deferential," and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); <u>Lambert</u>, 393 F.3d at 979–80; <u>Premo v. Moore</u>, 562 U.S. 115, 125 (2011) ("[H]abeas court must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel."); <u>cf. United States v. Howard</u>, 381 F.3d 873, 881 (9th Cir. 2004) ("When counsel has reason to question his client's competence to plead guilty, failure to investigate further may constitute ineffective assistance of counsel.").

Davis is not entitled to relief on ground 2.

# V.    CONCLUSION

IT IS THEREFORE ORDERED that the petition for a writ of habeas corpus, as amended, [ECF No. 29] is **GRANTED** as to ground 1. Petitioner James Anthony Davis's second amended judgment of conviction filed on May 9, 2008, in case number C197660 in the Eighth Judicial

District Court for the State of Nevada, is vacated. Within 120 days[7] of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this court's judgment, if affirmed, or (2) the expiration for seeking such appeal or review, Davis shall be released from all custody and/or other restraints, including parole or other supervision, unless, subject to the competency issues addressed within this order, the state files a written election in this matter of its intention to try Davis and thereafter commences jury selection.

IT IS FURTHER ORDERED that, to the extent required, Davis is denied a certificate of appealability with respect to ground 2.

IT IS FURTHER ORDERED that the Clerk of the Court is to (1) substitute Brian Williams for respondent Dwight Neven, (2) enter final judgment, granting the petition for a writ of habeas corpus as provided above, (3) provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court, in connection with that court's case number C197660, and (4) close this case.

Dated: This 28th day of August 2023.

_____
RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE

---

[7] Reasonable requests for modification of this time may be made by either party.